### Pratt v. Rounds.

(Decided October 20, 1914.)

### Appeal from Daviess Circuit Court.

1. Bills and Notes—Submission to Jury.—In an action by the holder of a note in which the defense is that the notes were obtained by fraud, and the plaintiff relies on being a bona fide purchaser

without notice, the value of the thing for which the notes were given should not be submitted to the jury.

2. Bills and Notes.—Burden of Proof.—In such an action the burden of proof is on the defendant, the notes making out a prima facie case for the plaintiff.

3. Bills and Notes—Instructions—Defects.—Where the plaintiff is a purchaser for value and in good faith, the court should have instructed the jury peremptorily to find for him unless there is evidence that he actually knew of the defect or the facts known to him were such as to make his action in negotiating the notes a fraud. Mere suspicion is not sufficient.

LOUIS I. IGLEHEART and EDWARD A. KENNEDY for appellant.

W. FOSTER HAYS and C. W. WELLS for appellee.

OPINION OF THE COURT BY CHIEF JUSTICE HOBSON—Reversing.

On February 2, 1912, Elizabeth M. Rounds, doing business in the name of B. H. Rounds & Sons, executed to the Brenard Manufacturing Company six notes, each for $50, due respectively in two, three, four, five, six and seven months. W. I. Pratt brought this suit upon the notes, alleging that the Brenard Manufacturing Company had assigned them to him for value before maturity in due course. Mrs. Rounds answered in substance that the notes had been obtained by fraud and denied that they had been assigned to Pratt. Pratt replied denying that the notes were obtained by fraud, and pleaded that he was a bona fide purchaser in due course for a valuable consideration and without notice of any infirmity in them. The case came on for trial before a jury, who found for the defendant. The plaintiff appeals.

Mrs. Rounds is the owner of a jewelry store in Owensboro, Kentucky. The Brenard Manufacturing Company is a partnership doing business at Iowa City, Iowa; they own a copyrighted plan under which pianos are put in the stores of merchants and the successful contestant in the contest gets the piano. They send out traveling men who make contracts with the merchants. One of their traveling men went to Owensboro, made a contract with Mrs. Rounds through her son, and obtained the notes in suit. The son's evidence as to the fraud in the obtaining of the notes is in substance this:

The traveling man came to the store representing that the Brenard Manufacturing Company was going to put pianos in Owensboro on sale, and they had a copyrighted plan of contest which he had misplaced, saying, "Now we will give in this contest so much commission on every piano that every man sells. We will handle this contest for you and all these contestants will be at work selling for your store." Rounds signed the contract, and gave the notes on this basis without seeing the copyrighted plan of contest. The contract was then sent to the Brenard Manufacturing Company and was approved by them. Ten days later Rounds, on examining the copyrighted plan of contest which in the meantime had been sent to him, saw that it was altogether a different proposition from that stated to him by the drummer. In the copyrighted plan the merchant was to get the contestants and keep them going; he was to have sole charge of it; the Brenard Manufacturing Company was not to send any man to Owensboro to assist in the contest or to sell any piano there. Finding that the proposition was entirely different from what it was represented to him, he, on February 12, wired the Brenard Manufacturing Company revoking his order and on the same day wrote to them stating fully the reasons. There was no contradictory evidence offered by the plaintiff. The only evidence offered by him was the deposition of Theodore O. Loveland, one of the firm of the Brenard Manufacturing Company. He testified that after receiving the contract and approving it, they immediately bought the piano and ordered it sent to Mrs. Rounds; that the piano was bought on February 5, and was in fact shipped by the makers of the piano on February 15; that they sold the notes to W. I. Pratt on February 8, or four days before they had notice by wire of the disaffirmance of the contract by Mrs. Rounds, and seven days before they received her letter; that they at the time had no notice of anything being wrong; that Pratt was not connected with the Brenard Manufacturing Company and never had been; that they bought their pianos each day as they received orders, handling from 500 to 1,000 a year; that they received the order on February 3; that the piano was shipped from Chicago; that in all they had sold Pratt about $40,000 worth of notes from time to time; that at the time of the transfer of these notes to Pratt they got $1,000 from him and transferred to him

$1,250 worth of notes. These questions and answers occur in his cross-examination:

"Q. Then for each dollar you received, you transferred to him $1.25 face value of the notes. A. Yes, sir. Q. Were these notes transferred without recourse, or is the Brenard Manufacturing Company responsible providing they are not collected? A. Do you mean by 'without recourse' that those words were written upon the note? Q. Yes. A. No; these words were not written on the note; they never were written on any note that we ever disposed of, to the best of my knowledge. Q. In case Mr. Pratt is unsuccessful in this suit and should fail to collect these notes, would it be Mr. Pratt's loss, or would the Brenard Manufacturing Company have to reimburse him for the money paid at the time they were transferred? A. We have no contract with Mr. Pratt to that effect. Q. Well, in the forty thousand ($40,000) dollars' worth of notes transferred to Mr. Pratt, have there been any which he has failed to collect? A. Not that I know of. If there have been, it has not been called to my attention. Q. The company then is in no way responsible to Mr. Pratt for the payments of these notes, if he should fail to recover in this suit? A. I think not; the $1.25 has always covered it. Q. In your transactions in this kind of notes, it has been found that the deposit of $1.25 worth of notes for one dollar in money advanced, covers all shrinkage and losses in the way of collections. A. That has been our experience. Q. And these notes were transferred to Mr. Pratt on that basis? A. Yes, sir."

The defendant offered no evidence contradicting Loveland, and the plaintiff, Pratt, did not testify on the trial. During the examination of a witness for the defendant, this occurred:

"(The Court) Have you any evidence as to the fair market value of that piano, Mr. Wells? (Mr. Wells) No, sir; I think not."

Again at the conclusion of the defendant's testimony, this occurred:

"(The Court I think that it is very material that the jury should know the fair market value of the piano.

"The court allows the defendant time in which to try and find a witness who will testify as to the value of the piano, and after due deliberation the defendant announced that he could find no witness who would testify on this point."

The court, by the fourth instruction which he gave the jury, told them in substance that although a fraud was practiced on the defendant at the time the notes were executed, yet if the Brenard Manufacturing Company sent the defendant goods of value, they might in their discretion find for the plaintiff the fair market value of the goods so sent. The instruction was erroneous, and in view of the remarks made by the court in the hearing of the jury, we are not assured that this may not have been prejudicial to the plaintiff, in view of the fact that the plaintiff gave no evidence as to the value of the piano, which had been shipped to Owensboro, and had been left in the railway station, the consignee declining to receive it. The suit was brought by W. I. Pratt as holder of the notes. He must recover if at all on the notes. The evidence offered by the defendant as to the fraud in the obtaining of the notes, was not contradicted, and so the essential question in the case was whether Pratt was a holder in due course for value and without notice. No question as to the value of the piano should have been injected into the case, for no fraud as to the piano was complained of; the fraud complained of related entirely as to the plan of contest.

The notes made out a *prima facie* case for the plaintiff, their execution being admitted. The burden of proof was, therefore, on the defendant, as the circuit court properly held.

The remaining question is, should the court under the testimony of Loveland, which was not contradicted, have instructed the jury to find for Pratt on the notes upon the ground that he was a holder in due course? Under the evidence which was undisputed the notes were assigned by the Brenard Manufacturing Company to Pratt on February 8, or four days before Rounds himself knew that a fraud had been perpetrated upon him and four days before he sent the telegram to the Brenard Manufacturing Company revoking his order. It is very evident, therefore, that there was nothing in the case to show that Pratt could have had notice of any infirmity in the notes when he purchased them on February 8, by reason of what had taken place in Owensboro between the salesman and Rounds.

Section 56 of the Negotiable Instrument Act is in these words:

"To constitute notice of an infirmity in the instrument or defect in the title of the person negotiating the

same, the person to whom it is negotiated must have had actual knowledge of the infirmity or defect, or knowledge of such facts that his action in taking the instrument amounted to bad faith.''

Section 57 also provides:

''A holder in due course holds the instrument free from any defect of title of prior parties and free from defenses available to prior parties among themselves, and may enforce payment of the instrument for the full amount thereof against all parties liable thereon.''

The notes being complete and regular on their face and having been transferred to Pratt before their maturity or dishonor, he was a holder in due course under sub-section 52, if he took them ''in good faith and for value'' and ''at the time had no notice of infirmity'' in them, or ''defect in the title of the person negotiating'' them. Sub-section 25 provides:

''Value is any consideration sufficient to support a simple contract. * * *''

That under the evidence Pratt took the notes for value must be admitted; he is, therefore, entitled to recover on them unless he did not take them in good faith or had actual knowledge of some infirmity in them or defect in the title of the person negotiating them or had knowledge of such facts that his action in taking them amounted to bad faith.

It is insisted that as Pratt did not testify on the trial, and as it appeared that he had bought $40,000 worth of notes from the Brenard Manufacturing Company, and as he bought these notes at a discount of 25% that the jury were warranted in inferring that he was not a holder in due course. But the plain meaning of the statute above quoted is that the rights of a purchaser of negotiable paper are not to be defeated upon suspicion. To defeat him under the statute the facts known to him must be such that his action in taking the instrument amounted to bad faith unless he has actual knowledge of the infirmity or defect. Pratt could have had no actual knowledge of the infirmity or defect under the evidence when he purchased the notes on February 8, and there were no facts known to him about the transaction in Owensboro when the notes were executed. The fact that he had purchased many notes from the Brenard Manufacturing Company and that he purchased these notes at a discount of 25% with other proof might be of considerable value, but standing alone they are not sufficient

to take the case to the jury. (Bothwell v. Corum, 135 Ky., 766; Ham v. Merritt, 150 Ky., 11.)

It is also insisted that the notes when executed were attached to the contract by a perforated line, and were, therefore, not negotiable. But there was in the contract authority to the Brenard Manufacturing Company to detach the notes, and when under this authority the notes were detached they stood as any other notes. Section 124, of the Negotiable Instrument Act, provides:

"Where a negotiable instrument is materially altered without the assent of all parties liable thereon, it is avoided, except as against a party who has himself made, authorized or assented to the alteration and subsequent endorsers."

Under this section Mrs. Rounds having consented to the notes being detached from the contract can not complain that they were detached. (Robertson v. Commercial Security Co., 152 Ky., 340.)

If, from the fact that Pratt had bought so many notes from the Brenard Manufacturing Company, it may be inferred that he was familiar with their way of doing business, and should have known that these notes had been detached from the contract, still he must also have known that the contract empowered the payee of the notes to do this; and his knowledge on this subject would in no way bring home to him knowledge of a fraud which had been practiced at Owensboro when the notes were given. This fraud was the sole ground of defense to the notes, and this had not been discovered by Rounds when, according to the evidence, Pratt purchased the notes.

The testimony of Loveland being uncontradicted and unimpeached, it can not be maintained that there is any evidence that Pratt did not take the notes in good faith, or that when he took them he had actual knowledge of some infirmity in them or defect in the title of the person negotiating them, or had knowledge of such facts that his action in taking them amounted to bad faith. We, therefore, conclude that under the evidence the court should have instructed the jury to find for the plaintiff.

If there was evidence tending to show that Pratt did not in good faith take the notes for value (sub-section 25, 51, section 3720-b, Kentucky Statutes) or that his purchase was colorable merely, or that he was charge-

able with notice of their infirmity, the case would be different.

Under the statute which had been in force in Kentucky up to the time the Negotiable Instrument Act took effect, promissory notes were assignable, but the assignee took them subject to all the defenses which the maker had to them in the hands of the assignor before notice of the assignment. That act, however changed the rule, and under it promissory notes which have been transferred to a holder in due course, that is, a *bona fide* purchaser without notice, are placed upon the footing of a bill of exchange, and are not subject to the equities which would obtain between the maker and the payee. Persons now who make such notes and deliver them, take the risk of their being transferred to a *bona fide* purchaser without notice. The statute changed the old rule, and must like other statutes be enforced according to its terms. Hard cases may arise, but the courts are powerless to afford a remedy. The Legislature alone has power to do this.

Judgment reversed and cause remanded for a new trial.